1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WAYNE MOULE, dba NORTHWEST METROLOGY,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED PARCEL SERVICE CO.,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:16-cv-00102-JLT<br><br>ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION<br><br>(Doc. 16) |

United Parcel Service Company seeks to compel arbitration and stay this action initiated by Plaintiff Wayne Moule, doing business as Northwest Metrology.  (Doc. 16)  For the following reasons, Defendant's motion to compel arbitration is **GRANTED**.

**I.      Background**

Plaintiff's business, Northwest Metrology, provides "calibration services for specific types of equipment such as electronic aviation equipment, oilfield equipment, and hospital equipment."  (Doc. 1 at 1, ¶ 3)  Plaintiff asserts that in January 2015, he prepared a piece of equipment called the Synthesized Generator Model #HP8673D ("SG") to be shipped to Hawaii, via UPS.  (*Id.* at 2, ¶ 7)

According to Plaintiff, he "packaged the box with several rounds of bubble wrap and it was taped security [sic]." (Doc. 1 at 2, ¶ 7)  He alleges warning stickers were placed on the box, including stickers that indicated "Fragile-Handle With Care" and "High Claim Item." (*Id.*, ¶ 9)  In addition, the box had a "75G Shock Watch" sticker, which "contains a device attached to it [and] lights red when

rough handling of the box occurs." (*Id.*) Plaintiff reports that "[t]he 75G Shock Watch sticker contained the following words: "HANDLE WITH CARE; RED INDICATES ROUGH HANDLING. IF RED, NOTE ON THE BILL OF LADING AND INSPECT PRODUCT." (*Id.*) Plaintiff asserts he "noted on paper with UPS the SG had a value of $27,000 and paid $528 for the item to be shipped." (*Id.*, ¶ 10)

Plaintiff alleges that when the box arrived in Hawaii, "the 75 G Shock Watch sticker was red showing that it had been extremely mishandled and the box was crushed and had been taped together." (Doc. 1 at 2, ¶ 11) He asserts the SG "was a total loss." (*Id.*)

Plaintiff asserts UPS was notified of the damage and sent an inspector, who "claimed that the equipment was packaged improperly in a 'used' single walled box." (Doc. 1 at 3, ¶12) Plaintiff contends this was untrue, and "the box appeared used because it had been mishandled badly." (*Id.*) In addition, Plaintiff reports that when a UPS driver picked up the box, "he indicated it was packaged adequately and that all high value items were inspected at the facility before being shipped." (*Id.*, ¶ 13) Plaintiff contends he "assumed by said representation that had the SG been packaged inappropriately, UPS would have informed Plaintiff of this after it was inspected." (*Id.*)

Plaintiff made a claim to UPS, "and a claims representative from Crawford and Company was assigned." (Doc. 1 at 3, ¶ 14) He reports that the representative "informed Plaintiff he would hear from an agent of UPS," but "Plaintiff never heard from an agent of UPS accepting or denying the claim." (*Id.*) Plaintiff contends that he hired counsel, who mailed a letter to the claims representative. (*Id.*, ¶ 15) On June 26, 2015, UPS sent a letter "finally denying the claim." (*Id.*)

Plaintiff contends that UPS "is liable for the value of the SG, or $27,000 pursuant to the terms of the Carmack Amendment, 49 U.S.C. 14706." (Doc. 1 at 4, ¶ 20) Defendant filed its answer on March 18, 2016, asserting the "claim is subject to a mandatory arbitration provision contained in the UPS Tariff/Terms and Conditions of Service." (Doc. 6 at 2) Accordingly, Defendant seeks to compel arbitration pursuant to the terms of the arbitration agreement. (Doc. 16)

## II.     The UPS Terms

The "UPS Tariff/Terms and Conditions of Service" ("UPS Terms") are applicable to UPS "shipments within and originating in the United States." (Doc. 18 at 2, Liberatore Decl. ¶ 1) The UPS

2

1    Terms "contains the general terms conditions of contract under which … [UPS] is engaged in the

2    transportation of Package shipments itself and jointly through interchange with its affiliates."  (Doc.

3    18-1 at 5)  The UPS Terms include a section entitled "Claims and Legal Actions:  Individual Binding

4    Arbitration of Claims," which provides:

5            Claimant and UPS agree that, except for disputes that qualify for state courts of limited
             jurisdiction (such as small claims, justice of the peace, magistrate court, and similar
6            courts with monetary limits on their jurisdictions over civil disputes), any controversy or
             claim, whether at law or equity, arising out of or related to the provision of services by
7            UPS, regardless of the date of accrual of such dispute, shall be resolved in its entirety by
             individual (not class-wide nor collective) binding arbitration.

8

9    (Doc. 18-1 at 27, emphasis omitted)  Shippers are informed that both parties "are waiving the right to

10   trial by jury," and "giving up the ability to participate in a class, mass, consolidated or combined action

11   or arbitration."  (*Id.*, emphasis omitted)  The UPS Terms—including the arbitration provision—is

12   intended to apply to all shipments, whether processed through the UPS WorldShip program or the

     company's website.  (*Id.* at 5; *see also* Doc. 18-2 at 5-6, Libertore Decl. ¶¶ 8-9)

13           Pursuant to the UPS Terms, "[a]ll issues are for the arbitrator to decide," though issues related

14   "to the scope, application, and enforceability of the arbitration provision" are reserved for the court.

15   (Doc. 18-1 at 28)  Further, the UPS Terms indicate "[t]he Federal Arbitration Act governs the

16   interpretation and enforcement of [the] provision."  (*Id.*)

17   **III.    Legal Standard**

18           The Federal Arbitration Act ("FAA") applies to arbitration agreements in any contract affecting

19   interstate commerce. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001); 9 U.S.C. § 2.

20   Here, it is undisputed that Defendant's operate nationwide and its shipping business affects interstate

21   commerce. Thus the FAA governs the arbitration policy.

22           Under the FAA, written arbitration agreements "shall be valid, irrevocable, and enforceable,

23   save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  A

24   party seeking to enforce arbitration agreement may petition the Court for "an order directing the parties

25   to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.

26           The court's role in applying the FAA is "limited to determining (1) whether a valid agreement

27   to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron*

28   *Corp. v. Ortho Diagnostic Systems*, 207 F.3d 1126, 1130 (9th Cir. 2000), citing 9. U.S.C. § 4.  "If the

1   response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration

2   agreement in accordance with its terms." *Id.*; *see also* 9 U.S.C. § 4 ("The court shall hear the parties,

3   and upon being satisfied that the making of the agreement for arbitration or the failure to comply

4   therewith is not in issue, the court *shall* make an order directing the parties to proceed to arbitration in

5   accordance with the terms of the agreement" (emphasis added)).  Importantly, because the FAA "is

6   phrased in mandatory terms," "the standard for demonstrating arbitrability is not a high one [and] a

7   district court has little discretion to deny an arbitration motion." *Republic of Nicaragua v. Standard*

8   *Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991).

9        A party opposing arbitration has the burden to demonstrate the claims at issue should not be

10  sent to arbitration.  *Green Tree Fin. Corp.- Alabama v. Randolph*, 531 U.S. 79, 81 (2000); *see also*

11  *Mortensen v. Bresnan Communications, LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013) ("the parties

12  challenging the enforceability of an arbitration agreement bear the burden of proving that the provision

13  is unenforceable").  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor

14  of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

15  **IV.    Discussion and Analysis**

16       **A.    Validity of the arbitration agreement**

17       When determining whether a valid and enforceable agreement to arbitrate has been established

18  for the purposes of the FAA, the Court should apply "ordinary state-law principles that govern the

19  formation of contracts to decide whether the parties agreed to arbitrate a certain matter." *First Options*

20  *of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Circuit City Stores v. Adams*, 279 F.3d 889, 892

21  (2002).  Because Plaintiff is a resident of California and Defendant seeks to compel arbitration in Kern

22  County, California, the Court looks to the state's law to determine whether there is a valid arbitration

23  agreement between the parties.

24       Pursuant to California contract law, the elements for a viable contract are "(1) parties capable

25  of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration." *United*

26  *States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (citing Cal. Civ. Code § 1550;

27  *Marshall & Co. v. Weisel*, 242 Cal. App. 2d 191, 196 (1966)).  An arbitration agreement may be

28  "invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but

4

1   not by defenses that apply only to arbitration or that derive their meaning from the fact that an

2   agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 333 (2011); *see*

3   *also* Cal. Code Civ. Proc. § 1281 (explaining an arbitration agreement may only be invalidated upon

4   the same "grounds as exist for the revocation of any contract").

5          Plaintiff contends there is not a binding contract because "there [was] no affirmative action

6   required to demonstrate assent to the terms and conditions."[1]  (Doc. 20 at 3)  In addition, Plaintiff

7   contends the terms of the arbitration provision are unconscionable and should not be enforced by the

8   Court.  (*Id.* at 5-10)

9                          1.     Consent to arbitrate

10         Generally "a party cannot be required to submit to arbitration any dispute which he has not

11  agreed so to submit." *AT&T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 648

12  (1986).  "'While new commerce on the Internet has exposed courts to many new situations, it has not

13  fundamentally changed the principles of contract.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171,

14  1175 (9th Cir. 2014), quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).  One

15  principle that remains unchanged is that "[m]utual manifestation of assent, whether by written or

16  spoken word or by conduct, is the touchstone of contract."  *Id.*, quoting *Specht v. Netscape Comm.*

17  *Corp.*, 306 F.3d 17, 29 (2d Cir. 2002).

18         Contracting parties manifest mutual assent when a "specific offer is communicated to the

19  offeree, and an acceptance is subsequently communicated to the offeror." *Netbula, LLC v. BindView*

20  *Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007), citing *Russell v. Union Oil Co*., 7 Cal. App.

21  3d 110, 114 (Ct. Cal. App. 1970).  With the Internet and digital software, the Court must examine how

22  the terms of an agreement were presented to a user, and how a user indicated his or her consent to the

23  terms. *Nguyen*, 763 F.3d at 1176-77.  The Ninth Circuit explained:

24         Contracts formed on the Internet come primarily in two flavors: "clickwrap" (or "click-
            through") agreements, in which website users are required to click on an "I agree" box
25         after being presented with a list of terms and conditions of use; and "browsewrap"
            agreements, where a website's terms and conditions of use are generally posted on the
26         website via a hyperlink at the bottom of the screen.

27

28         [1]  Plaintiff does not dispute that the parties are capable of entering a contract, that there was a lawful object, or the
       existence of consideration.  Rather, Plaintiff argues only the lack of consent to the arbitration agreement.

                                                          5

*Id.*, 763 F.3d at 1175-76.  Defendant appears to assert it used a "clickwrap" agreement (*see* Doc. 21 at 6), while Plaintiff argues UPS uses a "browsewrap" agreement that should not be enforced by the Court (Doc. 20 at 1-3).

A "clickwrap" agreement requires an affirmative action to indicate consent to terms. *Nguyen*, 763 F.3d at 1176; *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837-38 (S.D.N.Y. 2012) (describing "pure-form clickwrap agreement" as one in which the website "forces the user to actually examine the terms before assenting"); *Register.com, Inc.*, 356 F.3d at 429 ("under a clickwrap arrangement, potential licensees are presented with the proposed license terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product"). Given the indication of assent, courts have "routinely upheld" clickwrap agreements.  *United States v. Drew*, 259 F.R.D. 449, 462 n.22 (C.D. Cal. 2009).

In contrast, with a "browsewrap" agreement, the user "gives his assent simply by using the website." *Nguyen*, 763 F.3d at 1176 (quotation omitted).  Generally, "the website will contain a notice that – by merely using the services of, obtaining information from, or initiating applications within the website – the user is agreeing to and is bound by the site's terms of service." *Drew*, 259 F.R.D. at 462 n.22; *Fteja*, 841 F. Supp. 2d at 837 (same).  When there is no evidence users "had actual knowledge" of an agreement, the Court must consider the "design and content of the website and the agreement's webpage." *Nguyen*, 763 F.3d at 1177.  "[T]he validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id*.  Thus, the Court must consider the "design and content of the website and the agreement's webpage." *Id.*

Kenneth Liberatore, Functional User Manager at UPS, reports that when using the UPS WorldShip program, "[b]efore a shipper can transmit information (e.g., package size, weight, and destination to UPS…, the shipper must confirm its acceptance of the UPS Terms." (Doc. 18 at 5, Liberatore Decl. ¶ 8)  A window on the screen asks, "Are you ready to close today's shipping and send the information to UPS?"  (*Id.*)  The shipper is informed: "By clicking the Yes button, you agree to the UPS Tariff/Terms and Conditions," and provides a link to the UPS Terms.  (*Id.*)  If a shipper selects the "No" button, the shipping information is not transmitted to UPS and no transaction occurs.  (*Id.*)

6

1       Similarly, the UPS website requires consent to the UPS Terms.  (Doc. 18 at 6, Liberatore ¶ 9)

2   The first time a user processes a package for shipment through the website, and anytime thereafter if

3   the UPS Terms have been amended, the user "is automatically directed" to a screen entitled "Service

4   Terms and Conditions Update."  (*Id.*)  The screen directs the user to "Review Terms and Conditions:"

5       The Service Terms and conditions have been updated since your last visit.  Select View
    Terms and Conditions to see the current Service Terms and Conditions or Continue to
6       proceed with your shipping request.

7       UPS is making changes to the UPS Tariff/Terms and Conditions of Service, UPS
    Freight's Rules and Charges (UPGF102), UPS Express Critical Terms and Conditions
8       of Contract, and the UPS Air Freight Terms and Conditions of Contract beginning
    December 30, 2013.

9       **The documents will include a new section providing for binding arbitration of
10      claims, except as otherwise noted in the terms**.  To view the Individual Binding
    Arbitration of Claims section in the UPS Tariff/Terms and Conditions of Service, click
11      on the View button below.

12      The changes pertaining to UPS Freight®, UPS Express Critical and UPS Air Freight
    will contain substantially the same terms as provided in the Individual Binding
13      Arbitration of Claims Section.

14  (*Id.* at 7, ¶12) (emphasis added)  At the bottom of the page, the user could either click "Continue" or

15  click to "View Terms and Conditions."  (*Id.*)  If the user selected to view the terms, the next screen

16  contains a list of links, including to "UPS Tariff/Terms and Conditions and Services" and "Claims and

17  Legal Actions: Individual Binding Arbitration of Claims."  (*Id.*, ¶ 13)  By clicking either link, users are

18  directed to information that includes the UPS requirement to arbitrate claims.  (*Id.* at 8, ¶ 14)

19      Mr. Liberatore reports, "UPS's billing group was able to identify the Subject Package as a

20  package tendered to UPS on January 5, 2015 with tracking number 1Z37W6200361921507."  (Doc. 18

21  at 4, ¶ 4)  According to Mr. Liberatore, though Plaintiff identified the tracking number as

22  1Z37W6200361172728, UPS believes this was an error based upon the description of the package

23  alleged in the Complaint because "only the package associate with the tracking number ending in 1507

24  matches the alleged $528 charge."  (*Id.* ¶ 6 n.1)  Regardless, Mr. Liberatore reports "both packages

25  were shipped under Plaintiff's account, processed through the WorldShip® shipping system and billed

26  in the same manner."  (*Id.*)  In addition, Mr. LIberatore reports the records of Plaintiff's account

27  indicate "the user . . . clicked through the Service Terms and Conditions Update on ups.com numerous

28  times, including on January 22, 2014."  (*Id.* at 6, ¶ 10)

1   Significantly, the WorldShip and ups.com systems could best be described as a modified

2   clickwrap agreement, because the screens asked the user to confirm acceptance of the UPS Terms,

3   though the terms were not identified on the same page.  *See, Swift v. Zynga Game Network, Inc.*, 805 F.

4   Supp. 2d 904, 911-912 (N.D. Cal. 2011) (defining "modified clickwrap" agreement as an agreement

5   where "the plaintiff was provided notice and an opportunity to review terms of service prior to

6   acceptance").  In *Swift*, the court rejected the plaintiff's argument that she was not given notice of the

7   contractual terms to which she consented "[b]ecause Plaintiff was provided with an opportunity to

8   review the terms of service in the form of a hyperlink immediately under the 'I accept' button and she

9   admittedly clicked 'Accept.'"  *Id.* at 912.  Likewise, here, the UPS shipper was informed: "By clicking

10  the Yes button, you agree to the UPS Tariff/Terms and Conditions."  (Doc. 18 at 5, ¶ 8) In addition,

11  immediately below this statement, and above the "Yes" button, a hyperlink to the "Terms and

12  Conditions" was provided.  (*Id.*) Because it is undisputed that Plaintiff had the opportunity to view the

13  Terms and Conditions and clicked the "Yes" button to process the shipment, the Court finds Plaintiff

14  manifested assent to the UPS Terms when arranging the shipment at issue.[2] Accordingly, Plaintiff's

15  argument that there was no binding contract due to lack of consent fails.

16            2.     Unconscionability

17  A contract "is unenforceable if it is both procedurally and substantively unconscionable."  *Davis*

18  *v. O'Melveny & Myers*, 485 F.3d 1066, 1072 (9th Cir. 2007)).  Procedural unconscionability focuses on

19  "oppression and surprise," while substantive unconscionability focuses upon "overly harsh or one-sided

20  results."  *Stirlen v. Supercuts, Inc.*, 51 Cal.App.4th 1519, 1532 (1997) (citations omitted).  Both forms

21  of unconscionability must be present in order for a court to find a contract unenforceable, but it is not

22  necessary that they be present in the same degree.  *Davis*, 485 F.3d at 1072; *Stirlen*, 51 Cal. App. 4th at

23  1532.  Consequently, "[c]ourts apply a sliding scale: 'the more substantively oppressive the contract

24  term, the less evidence of procedural unconscionability is required to come to the conclusion that the

25  term is unenforceable, and vice versa.'"  *Id.* (quoting *Armendariz v. Foundation Health Psychcare*

26  _____

27      [2] Moreover, Defendant presented evidence that Plaintiff also processed shipments through the website and
received notice of the arbitration requirement by clicking through the "Service Terms and Conditions Update" screen when
processing other shipments with UPS.  (*See* Doc. 18 at 6, ¶ 10)  Accordingly, Plaintiff received adequate notice of the UPS

28  Terms through that system as well, and indicated consent by placing the orders. *See Nguyen*, 763 F.3d at 1177.

1  *Services, Inc.*, 24 Cal. 4th 83, 99 (2000)).

2                              a.       Procedural Unconscionability

3          Procedural unconscionability focuses on the "manner in which the contract was negotiated and

4  the circumstances of the party at the time." *Kinney v. United Healthcare Servs.*, Inc., 70 Cal. App. 4th

5  1322, 1329 (1999).  The Court must consider both oppression and surprise "due to unequal bargaining

6  power." *Armendariz*, 24 Cal. 4th at 114.  Oppression derives from a lack of "real negotiation and an

7  absence of meaningful choice," while surprise arises from the terms of the bargain being "hidden in a

8  prolix printed form," or drafted in "fine-print terms." *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1288

9  (2008); *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 911 (2015).

10                              i.       *Oppression*

11         The threshold issue for oppression with procedural unconscionability "is whether the subject

12 arbitration clause is part of a contract of adhesion." *Stirlen*, 51 Cal. App. 4th at 1532; *see also Soltani*

13 *v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1042 (9th Cir. 2001).  A contract of adhesion "is a

14 standardized contract, which, imposed and drafted by the party of superior bargaining strength,

15 relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Graham*

16 *v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 817 (1981).  An arbitration clause on a "take it or leave it" basis

17 demonstrates "quintessential procedural unconscionability." *Aral v. Earthlink, Inc.*, 134 Cal.App.4th

18 544, 557 (2005).  Accordingly, the Court must examine "the manner in which the contract was

19 negotiated and the circumstances of the parties at that time."  *Kinney v. United Healthcare Services*,

20 70 Cal. App. 4th 1322, 1327 (1999).

21         It is undisputed that the UPS Terms were offered on a "take it or leave it" basis—giving users

22 the option to either accept the UPS Terms or find another shipping service.  Accordingly, the

23 "oppression" element is satisfied.

24                              ii.      *Surprise*

25         Plaintiff contends the arbitration agreement was "procedurally unconscionable as the plaintiff

26 was not even aware an arbitration provision was found in the hyperlinked terms and conditions."

27 (Doc. 20 at 6)  Specifically, David Brown, the "shipping manager/customer service representative" for

28 Northwest Metrology, reported:

                                              9

1         In performing my job duties I have utilized the defendant ("UPS") for the
shipping needs for Northwest Metrology, and use that company's website for our

2    shipping materials.  In doing so, I would merely hit the prompts that require me to
continue until I am able to confirm a shipping label is printed.

3
     During the four years of working as the shipping manager/customer service

4    representative for Northwest Metrology, I have never read the terms and conditions of
UPS while utilizing the UPS online database for shipping.  Until I learned of this

5    motion, I was unaware of any arbitration provision or clauses found on the UPS
website or within UPS' terms and conditions, and was surprised to learn of their

6    existence.

7    (Doc. 20-2 at 3, Brown Decl. ¶¶ 2-3)

8         Significantly, under California law, Plaintiff cannot avoid the terms of a contract by asserting a

9    representative failed to read the UPS Terms when provided with an opportunity to do so, or that he

10   does not recall receiving notice of the UPS Terms.  *See Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d

11   1185, 1198 (N.D. Cal. 2015) (explaining that "it is essentially irrelevant whether a party actually reads

12   the contract or not, so long as the individual had a legitimate *opportunity* to review it" (emphasis in

13   original); *Marin Storage & Trucking, Inc.*, 89 Cal.App.4th at 1049 ("A party cannot avoid the terms of

14   a contract on the ground that he or she failed to read it before signing"); *Bolanos v. Khalatian*, 231

15   Cal.App.3d 1586, 1590 (1991) (finding a party "with the capacity of reading and understanding an

16   instrument" may not avoid terms of a contract "on the ground he failed to read it before signing").  As

17   discussed above, Plaintiff received notice of the UPS Terms—including the requirement for binding

18   arbitration—through use of the WorldShip program and ups.com.  Though Mr. Brown elected to

19   "merely hit the prompts" rather than read the notifications, Plaintiff fails to show "surprise" because the

20   terms were not hidden from view or drafted in "fine-print terms." *See Bruni*, 160 Cal. App. 4th at 1288;

21   *Sanchez*, 61 Cal. 4th at 911.

22                   c.     Conclusion

23        Because the agreement to submit to the dispute resolution program was offered on a "take it or

24   leave it" basis, the agreement was procedurally unconscionable.  *Circuit City Stores, Inc. v. Adams*,

25   279 F.3d 889, 893 (9th Cir. 2002).  However, the lack of surprise supports a conclusion that the level

26   of procedural unconscionability is lessened.  *See Stirlen*, 51 Cal.App.4th at 1532 (directing the court to

27   consider both "oppression and surprise").

28   ///

b.     Substantive Unconscionability

"Substantive unconscionability addresses the fairness of the term in dispute." *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100 (Ct. App. 2002). While "parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope," substantive unconscionability "limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting the forum for itself." *Ting v. AT&T*, 319 F.3d 1126, 1149 (9th Cir. 2003) (quoting *Armendariz*, 24 Cal. 4th at 118).  Thus, the focus of the Court's inquiry is whether an agreement is one-sided and will have an overly harsh effect on the party not given an opportunity to negotiate its terms.  *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 854 (2001).

The Ninth Circuit instructs courts applying California law to arbitration agreements "look beyond facial neutrality and examine the actual effects of the challenged provision." *Ting*, 319 F.3d at 1149; *see, e.g., Ingle v. Circuit City Stores, Inc.*, 328 F.3d at 1165, 1180 (2003) (finding an arbitration agreement substantively unconscionable upon review of the agreement's provisions, including claims subject to arbitration, its statute of limitations, class actions, fee and cost-splitting arrangements, remedies available, and termination/ modification of the agreement).  Plaintiff contends the agreement is substantively unconscionable "due to the requirement of forcing Plaintiff to pay costs," its confidentiality requirement, and limitations on discovery.  (Doc. 20 at 6, 6-10) (emphasis omitted).

*i.     Claims subject to arbitration*

An arbitration agreement that compels arbitration for claims of the individual but exempts from arbitration those claims of the corporation is substantively unconscionable. *See Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 785 (2002) (citing *Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 175-76 (Ct. App. 2002)). In this case, the UPS Terms and the specific arbitration provision apply to "[a]ny controversy or claim arising out of or related to the provision of services by UPS." (Doc. 18-1 at 28) Thus, it does not appear that Defendant excluded claims it may bring against Plaintiff or other shippers from the arbitration agreement. Accordingly, the claims subject to arbitration are not unconscionable. *See Ferguson*, 298 F.3d at 784, n.6 (explaining substantive unconscionability may be demonstrated when a defendant seeks to enforce "what is essentially a unilateral arbitration agreement").

11

*ii.      Filing fees and cost arrangement*

An arbitration agreement containing a cost-splitting provision is substantively unconscionable. For example, the Ninth Circuit found a provision substantively unconscionable when the agreement forced the plaintiffs to pay the filing fee up to a maximum of $125.00 and share costs equally after the first day of arbitration. *Ferguson*, 298 F.3d at 781*; see also Ingle*, 328 F.3d at 1177-78 (finding a provision substantively unconscionable that stated "each party shall pay one-half of the costs of arbitration following the issuance of the arbitration award").  Similarly, a party cannot be required "to bear any *type* of expense that [he or she] would not be required to bear . . . in court." *Armendariz*, 24 Cal. 4th at 110 (emphasis in original)

The UPS Terms indicate: "Any filing fee or administrative fee required of Claimant by the AAA Rules shall be paid by Claimant to the extent such fee does not exceed the amount of the fee required to commence a similar action in a court that otherwise would have jurisdiction."  (Doc. 18-1 at 28)  Thus, the UPS Terms do not require Plaintiff to incur any *type* of expense other than may similarly be paid in court.  Further, there is no indication that Plaintiff could be held responsible for half the costs of arbitration, and the arbitrator may award costs "to the extent such allocation or award is available under applicable law." (Doc. 18-1 at 28) Accordingly, the fees and costs arrangement is not substantively unconscionable.[3]

*iii.      Limitations on discovery*

California law requires that an arbitration agreement "provide for adequate discovery." *Armendariz*, 24 Cal. 4th 83 at 122.  In *Armendariz*, the court observed that parties are "permitted to agree to something less than the full panoply of discovery provided in Code of Civil Procedure section 1283.05." *Id.* at 106.

Plaintiff contends the AAA Rules incorporated by the UPS Terms impose "substantial limits on discovery."  (Doc. 20 at 8)  The AAA Rules for discovery provide:

The arbitrator may, on application of a party or on the arbitrator's own initiative:

i.    require the parties to exchange documents in their possession or custody on which they intend to rely;

---

[3] To the extent the UPS Terms incorporate the AAA Rules for arbitration, Plaintiff does not identify any expenses that are not similar to those that may be incurred in a court proceeding.

ii.   require the parties to update their exchanges of the documents on which they intend to rely as such documents become known to them;

iii.  require the parties, in response to reasonable document requests, to make available to the other party documents, in the responding party's possession or custody, not otherwise readily available to the party seeking the documents, reasonably believed by the party seeking the documents to exist and to be relevant and material to the outcome of disputed issues; and

iv.  require the parties, when documents to be exchanged or produced are maintained in electronic form, to make such documents available in the form most convenient and economical for the party in possession of such documents, unless the arbitrator determines that there is good cause for requiring the documents to be produced in a different form. The parties should attempt to agree in advance upon, and the arbitrator may determine, reasonable search parameters to balance the need for production of electronically stored documents relevant and material to the outcome of disputed issues against the cost of locating and producing them.

(Doc. 20-1 at 27-28, AAA R-22)  Thus, Plaintiff argues the AAA Rules "do[] not allow depositions at all," and "there is nothing like the Federal Rules of Civil Procedure to give guidance in relation to discovery."  (Doc. 20 at 9)  Plaintiff notes that "in *Martinez v. Master Protection Corp*. (2004) 118 Cal.App.4th 107, the court found the discovery limitation evidenced the otherwise one-sidedness of the agreement:

> We recognize that in many employment disputes restricting a plaintiff to a single deposition and document request could place him at a serious disadvantage if testimony from numerous witnesses is necessary to prepare his case. We also are aware the same restriction could operate to the employer's advantage, because it has ready access to most of the relevant documents and many of the witnesses remain in its employ. Consequently, the employer has far less need for discovery in order to prepare for arbitration than the employee which is not limited by the terms of the agreement."

(*Id.*)  Further, Plaintiff observes that in *Fitz v. NCR Corp*., the court determined a limitation to two depositions was unconscionable where a provision "[g]ranting the arbitrator discretion to determine whether additional discovery is necessary, as the ACT policy does, is an inadequate safety valve."  (*Id.* at 13, quoting *Fitz,* 118 Cal. App. 4th 702, 717 (2004)).

In *Fitz*, there was a limitation on depositions "unless the arbitrator finds a compelling need to allow it."  *Id.*, 118 Cal. App. 4th at 716.  The arbitration agreement "require[d] the arbitrator to limit discovery as specified in the agreement unless the parties can demonstrate that a fair hearing would be *impossible* without additional discovery."  *Id.* (emphasis added).  The court found that despite the provision allowing the arbitrator to grant additional discovery, the arbitrator was "constrained" by the "impossibility standard."  *Id.* at 717.  The court explained, "we do not believe that an employee should

be forced to demonstrate this impossibility to an arbitrator before being granted access to the type of discovery that is necessary for a fair opportunity to vindicate her claim." *Id.* at 719.  Accordingly, the court determined that the provision regarding discovery was substantively unconscionable.  *Id.*  In contrast, here, the arbitrator is not held to an "impossibility" standard, and no party has a burden of proof in seeking additional discovery.

Similarly, the UPS Terms may be distinguished from the provisions before the court in *Martinez*, where the arbitration agreement, "absent a demonstration of 'substantial need,' restrict[ed] discovery to a single deposition and a document request."  *Id.*, 118 Cal. App. 4th at 118.  Under the UPS Terms, there is no requirement for parties to show a "substantial need" before the arbitrator may approve a request for additional discovery.  Because the AAA Rules allow the arbitrator to authorize discovery, either on his own initiative or by a request—without a showing of either a "substantial need" that a fair hearing would be "impossible" without such discovery—the discovery provision is not substantively unconscionable.  *See, e.g.*, *Jacovides v. Future Foam, Inc.,* 2016 U.S. Dist. LEXIS 57530 at *31 (N.D. Cal. Apr. 25, 2016) (finding the initial limitation to one deposition in an arbitration agreement was not substantively unconscionable where it allows "discovery without the limitation of a high standard such as "impossib[ility]" of a fair hearing without such discovery … or "substantial need") (internal citations omitted).

### v. Remedies

Remedy provisions that "fail[] to provide for all the types of relief that would otherwise be available in court" by limiting an employee's total and punitive damages are substantively unconscionable.  *Adams*, 279 F.3d at 895 (citing *Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1482 (9th Cir. 1997)).  The UPS Terms grants the arbitrator the authority to "the same damages and relief that a court can award under the law." (Doc. 18-1 at 27)  Because the available remedies are not improperly limited, the provision is not substantively unconscionable.

### vi. Unilateral amendment and termination

The UPS Terms provide that "UPS reserves the right to unilaterally modify or amend any portion of the Service Guide or the Terms at any time without prior notice."  (Doc. 18-1 at 33)  When, as here, a provision of an agreement permits a company to unilaterally amend or terminate the

14

agreement, even with written notice, that provision is substantively unconscionable.  *See, e.g., Ingle*, 328 F.3d at 1179; *Ramirez-Baker v. Beazer Homes*, 636 F. Supp. 2d 1008, 1021-22 (E.D. Cal. 2008).  Consequently, the provision governing "future changes" is substantively unconscionable.

<i>vii.</i>      <i>Confidentiality requirement</i>

Plaintiff contends, "The arbitration provision is substantively unconscionable due to his confidentiality requirement."  (Doc. 20 at 7, emphasis omitted)  Specifically, the UPS Terms provide in relevant part:

> **Confidentiality of Arbitration**
> Notwithstanding anything to the contrary in the AAA Rules, UPS and Claimant agree that the filing of arbitration, the arbitration proceeding, any documents exchanged or produced during the arbitration proceedings, any briefs or other documents prepared for the arbitration, and the arbitral award shall all be kept fully confidential and shall not be disclosed to any other party, except to the extent necessary to enforce this arbitration provision, arbitral award or other rights of the parties, or as required by law or court order.  This confidentiality provision does not foreclose the American Arbitration Association from reporting certain consumer arbitration case information as required by state law.

(Doc. 18-1 at 29)  Plaintiff asserts "[t]his confidentiality clause, although facially mutual, in reality is not."  (Doc. 20 at 8, citing *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003)).

In *Ting v. AT&T*, the Ninth Circuit examined a confidentiality clause that provided: "Any arbitration shall remain confidential.  Neither you nor AT&T may disclose the existence, content or results of any arbitration or award, except as may be required by law or to confirm and enforce an award." *Id.*, 319 F.3d at 1151, n.16.  The Court observed that "confidentiality provisions usually favor companies over individuals," explaining that a company could "place[] itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, [the company] accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract." *Id.* at 1151-52.  In addition, the Court observed that "the unavailability of arbitral decisions may prevent potential plaintiffs from obtaining the information needed to build a case of intentional misconduct or unlawful discrimination." *Id.* at 1152.

On the other hand, as Defendant argues, California law does not mandate a finding that a confidentiality provision is "per se unconscionable."  (Doc. 21 at 16, citing *Sanchez v. Carmax Auto Superstores Cal., LLC*, 224 Cal.App.4th 398, 408 (2014). In *Sanchez*, the Court found the "provision

15

requiring confidentiality is not unconscionable." *Id.*, 224 Cal.App.4th at 408 (citing *Woodside Homes of Cal., Inc. v. Superior Court*, 107 Cal.App.4th 723, 732 (2003)) Rather, California law recognizes that a confidentiality requirement may be imposed to protect "a legitimate commercial need" as well as a company's "trade secrets and proprietary and confidential information" from public disclosure. *See Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1250 (2016).

Defendant has not identified any commercial need for the proceedings to remain confidential, and it appears the confidentiality requirement places UPS in a superior legal posture. *See Ting*, 319 F.3d at 1151. Consequently, the Court finds the confidentiality provision is substantively unconscionable. However, this provision may be severed from the remainder of the agreement. *See, e.g.*, *Grabowski v. C.H. Robinson Co.*, 817 F. Supp. 2d 1159 (S.D. Cal. 2011) (finding three substantively unconscionable provisions could be severed from an arbitration agreement which was not "permeated by unconscionability," thus rendering the agreement enforceable); *Stacy v. Brinker Rest. Corp.*, 2012 U.S. Dist. LEXIS 150345, at * 31-32 (E.D. Cal. Oct. 18. 2012) (explaining the substantively unconscionable provision could be severed because it was "collateral to the Agreement and does not permeate the Agreement with unconscionability").

### viii.    Agreement as a whole

California law provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a). Refusing to enforce an arbitration agreement is appropriate "only when an agreement is permeated by unconscionability." *Armendariz*, 24 Cal.4th 83 at 122 (internal quotation marks omitted). Courts often look to whether the offending provisions "indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." *Id.* at 124; *see also Ferguson*, 298 F.3d at 787-88. For example, the Ninth Circuit found an arbitration agreement was "permeated by unconscionable clauses" where there was a "lack of mutuality regarding the type of claims that must be arbitrated, the fee provision, and the discovery provision." *Ferguson*, 298 F.3d at 788.

1   In this agreement, the provisions of the UPS Terms appearing substantively unconscionable are

2   those regarding the confidentiality and granting unilateral amendment and termination of the dispute

3   resolution program.  However, the EDR Program provisions regarding claims subject to arbitration,

4   discovery, fees, costs, and remedies are not permeated by unconscionability and do not establish an

5   inferior forum that works to Defendant's advantage.  *See Armendariz*, 24 Cal. 4th 83 at 122.

6   Significantly, the unconscionable provisions are not relevant to Plaintiff's claims, and may be severed

7   from the agreement.  *See Grabowski*, 817 F. Supp. 2d 1159; *Stacy*, 2012 U.S. Dist. LEXIS 150345 at *

8   31-32.  Accordingly, the terms, taken as a whole, do not appear substantively unconscionable.

9       **B.**    **Whether the Agreement encompasses the Disputed Issue**

10   Plaintiff contends its single cause of action arising under the Carmack Amendment[4] is not

11   encompassed within the arbitration agreement.  (Doc. 20 at 4-5)  The Carmack Amendment preempts

12   any state common law action against a common carrier for damage to belongings transported in

13   interstate commerce. *See Adams Express Co. v. Croninger*, 226 U.S. 491, 505-06 (1913); *Hughes

14   Aircraft v. North American Van Lines*, 970 F.2d 609, 613 (9th Cir. 1992). "[T]he Carmack Amendment

15   is the exclusive cause of action for interstate-shipping contract claims alleging loss or damage to

16   property."  *Hall v. North American Van Lines, Inc.*, 476 F.3d 683, 688 (9th Cir. 2007).  It establishes "a

17   nationally uniform policy governing interstate carriers' liability for property loss." *New York. N. H. &

18   H. R. Co. v. Nothnagle*, 346 U.S. 128, 131 (1953).  As such, the Ninth Circuit determined "the Carmack

19   Amendment constitutes a complete defense to common law claims alleging all manner of harms."  *Hall*

20   at 687.

21   Plaintiff contends that because the Carmack Amendment is a federal statute, the failure to

22   specifically reference it in the arbitration agreement is a "fatal flaw."[5]  (Doc. 20 at 4)  As Plaintiff

23

24   ────────────

25   [4] Defendant disputes that the Carmack Amendment applies because the Amendment applies only to contracts for shipping over rail or by truck.  UPS notes that the package was shipped to Hawaii which means, by necessity, that the package was not shipped by rail or truck and surmises it was shipped by air.  Whether by air or cargo vessel, the Carmack Amendment would not apply.  However, it is probable that the package was shipped via truck or rail initially after the plaintiff tendered it.  UPS fails to discuss whether the Carmack Agreement applies in this type of situation.  See e.g.,

26

27   *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 101 (2010) Carmack Amendment applies where the *receiving* carrier—as opposed to the *connecting* carrier—issues a Carmack-compliant bill of lading.]

28   [5] Notably,  "The [FAA]'s centerpiece provision makes a written agreement to arbitrate 'in any maritime transaction or a contract evidencing a transaction involving commerce ... valid, irrevocable, and enforceable, save upon such grounds as

observes, courts have determined that "arbitration provisions concerning federal statutory rights are only enforceable where the arbitration clause "clearly and unmistakably" designates the federal statute at issue is subject to arbitration." (Doc. 20 at 4, citing *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 248 (2009) (emphasis omitted)).   In enacting the Carmack Amendment, Congress prohibited forced arbitration of disputes related to shipping household goods, but did not provide an exception for disputes arising from shipping contracts for any other goods. *Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115, 1124 (9th Cir. 2011).  Thus, the FAA applies unless the plaintiff demonstrates "Congress intended to preclude a waiver of a judicial forum" for the claim. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (U.S. 1991).

Notably, court have held there must "be at least a knowing agreement to arbitrate employment disputes before an employee may be deemed to have waived the comprehensive statutory rights, remedies and procedural protections prescribed in Title VII and related state statutes." *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1304 (9th Cir. 1994).  However, the plaintiff does not cite to any authority that a similar knowing waiver is required in other cases outside of the employment arena. Indeed, while not holding that the FAA applies to Carmack Amendment claims, the Ninth Circuit has upheld arbitration awards under the FAA in these cases.  *White v. Mayflower Transit, L.L.C.,* 543 F.3d 581, 586 (9th Cir. 2008).

In any event, the UPS Terms indicate they apply to "[a]ny controversy or claim arising out of or related to the provision of services by UPS."  (Doc. 18-1 at 28)  Thus, the plain language of the UPS Terms indicates that the disputed issue—which arises from the handling of a package Plaintiff shipped with UPS—is encompassed within the arbitration provision, and has not been excluded from arbitration.  "In the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-86 (1960).  The Court holds that because the Carmack Amendment governs *all* disputes related to shipment of goods[6]

---

exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985).  "Commerce" includes shipping between states.  9 U.S.C. § 1.
[6] *White*, 543 F.3d 586 [All claims arising from the "same conduct as the claims for delay, loss or damage to shipped property" are preempted by the Carmack Amendment.

and because it provides the "exclusive cause of action for interstate-shipping contract claims alleging loss or damage to property" (*Hall*, 476 F.3d at 688), requiring the UPS Terms to specifically reference the Carmack Amendment would be redundant and would cause confusion rather than provide clarity.

**V.      Conclusion**

Plaintiff and Defendant entered into a valid arbitration agreement, which encompasses the issue in dispute.  As a result, "there is a presumption of arbitrability" and Defendant's motion to compel arbitration should not be denied.  *See AT&T Tech., Inc.*, 475 U.S. at 650.

Accordingly, **IT IS HEREBY ORDERED**:

1.      The clauses governing amendment, and confidentiality are severed from the UPS Terms;

2.      Defendant's motion to compel arbitration is **GRANTED**;

3.      The matter is **STAYED** to allow the completion of the arbitration;

4.      Within 120 days and every 120 days thereafter, counsel **SHALL** file a joint status report.  In addition, within 10 days of the determination by the arbitrator, counsel **SHALL** file a joint status report; and

5.      The Court retains jurisdiction to confirm the arbitration award and enter judgment for the purpose of enforcement.

IT IS SO ORDERED.

Dated:   **July 7, 2016**                              **/s/ Jennifer L. Thurston**
                                                    UNITED STATES MAGISTRATE JUDGE

19